SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Peter C. LYBRAND, f/k/a Peter C. Tos-
to, Richard S. Kern, Donald R. Kern,
Charles Wilkins, Admiral Investments
Ltd., Compulink International Corp.,
Drawbridge Investments Ltd., Glitter-
grove Investments Ltd., Grafton In-
vestments Ltd., Greenford Invest-
ments Ltd., McDonalds Ltd., Oasis
Enterprises Ltd., Investor Relations,
Inc., Tellerstock, Inc., Conversant En-
terprises, Inc., EFI Corp. a/k/a Elec-
tronic Funds, Inc., Barclay Bankcard,
Inc., Canyon Vista Corp., Salteaux
Ltd. a/k/a First American Security
Corp. a/k/a First American Securities
Corp., Defendants,

and

Hannah G Irrevocable Trust and
Hannah R Trust, Relief
Defendants.

No. 00 CIV.1387 SHS.

United States District Court,
S.D. New York.

May 10, 2002.

**386**

Antonia Chion, William R. Baker, III, Christian J. Mixter, Charles J. Clark, Christina S. Yu, Securities and Exchange Commission, Washington, DC, David P. Stich, Solomon, Pearl, Blum, Heymann & Stich, L.L.P., New York City, for Securities and Exchange Commission, Plaintiff.

David P. Stich, Solomon, Pearl, Blum, Heymann & Stich, L.L.P., New York City, for Peter C. Lybrand, Richard S. Kernn, Donald R. Kern, Charles Wilkens, Admiral Investments Ltd., Compulink International Corp., Drawbridge Investments, Ltd., Glittergrove Investments Ltd., Grafton Investments Ltd., Greenford, Investments Ltd., McDonalds Ltd., Oasis Enterprises Ltd., Investor Relations, Inc., Tellerstock, Inc., Conversant Enterprises, Inc., EFI Corp., Barclay Bankcard, Inc., Canyon Vista Corp., Salteaux Ltd., Hannah G. Irrevocable Trust, Hannah R. Trust, defendants.

Sheryl A. Whipple, Brenman, Bromberg & Tenenbaum, PC, Denver, CO, for Canyon Vista Corp.

### OPINION & ORDER

STEIN, District Judge.

The Securities and Exchange Commission ("SEC") brought this civil enforcement action charging Peter C. Lybrand, Richard S. Kern, Donald R. Kern and Charles Wilkins with violations of the securities laws in connection with the public sale of shares in three "shell" corporations. The SEC alleges that 1) Lybrand, Wilkins and the Kerns illegally traded securities in interstate commerce without filing the registration statements required by Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c); and 2) Lybrand, aided and abetted by Wilkins and the Kerns, defrauded investors by engaging in matched trades of shares in those corporations in order to create the appearance of voluminous trading and artificially inflate the value of the shares in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10(b)–5 thereunder, 17 C.F.R. § 240.10b–5. The corporations employed in the scheme and two trusts that received a portion of the proceeds were also named as defendants. Lybrand and the entities he controlled did not file or serve an answer to the complaint and the Court entered a default judgment against these defendants on March 29, 2002.[1] The SEC has now moved for summary judgment against defendants Richard Kern, Donald Kern, Charles Wilkins, EFI Corp., Barclay Bankcard, Inc., Canyon Vista Corp., and Salteaux Ltd. on the Section 5 claim and

---

1. The defaulting corporate defendants were: Admiral Investments Ltd., Compulink Int'l Corp., Conversant Enterprises, Inc., Drawbridge Investments Ltd., Glittergrove Investments Ltd., Grafton Investments Ltd., Greenford Investments Ltd., Investor Relations, Inc., McDonalds Ltd., Oasis Enterprises Ltd., and Tellerstock, Inc.

against relief defendants Hannah G Irrevocable Trust and Hannah R Trust on the grounds that they received ill-gotten funds. Defendants have cross-moved for summary judgment on the aiding and abetting claim. For the reasons set forth below, the SEC's motion is granted and defendants' motion is denied.

## I. BACKGROUND

### A. Cast of Characters

Lybrand, formerly known as Peter Tosto, is a stock promoter and recidivist securities law violator who has participated in more than 22 separate incidents of illegal stock manipulation. *See United States v. Browne,* 130 F.Supp.2d 552, 554 (S.D.N.Y. 2001). In May 1994, Lybrand entered into a plea agreement with the United States Attorney for the Southern District of New York that obligated him, among other things, to truthfully respond to any inquiries the government made of him and to "not commit any further crimes whatsoever." (Simpson Dec. Ex. E, ¶ 12.) Notwithstanding this agreement, in April 1998 Lybrand began concealing from the government his ownership of eight foreign and three domestic entities originally named as defendants in this action. He continued to make false statements to the U.S. Attorney's Office and the SEC throughout their investigation of the transactions at issue in the present complaint until his arrest in February 2000. (Simpson Dec. SA1109–10.)

Richard Kern and his brother Donald have engaged in a number of small business ventures together. The Kerns jointly owned or controlled corporate defendants EFI Corp., also known as Electronic Funds, Inc. ("EFI"), Barclay Bankcard, Inc., and Canyon Vista Corp. (Simpson Dec. A265–67.) They also created relief defendants Hannah G Irrevocable Trust and Hannah R Trust, both of which are trusts benefitting the Kerns' respective children. (A269, B194.) Charles Wilkins owned and controlled corporate defendant Salteaux, Ltd., also known as either First American Security Corp. or First American Securities Corp. (A306–07.)

In the mid–1990s, the Kerns and Wilkins were jointly engaged in the business of creating and selling publicly traded "shell" corporations. (A140–45, A1026.) A "shell" corporation is one that has neither assets nor revenues and generally exists as a vehicle for another company's business activities. *See Black's Law Dictionary* 344 (7th Ed.1999). Once approved for public trading, such corporations could be sold for between $200,000 and $500,000, typically for merger with companies that were not approved for public trading. (*See* Bromberg Aff. B127.) In 1997 and 1998 defendants secured listings on the over-the-counter ("OTC") bulletin board market operated by the National Association of Securities Dealers ("NASD") for seven shell corporations, including the three corporations at issue in this action: Polus, Inc., Citron, Inc., and Electronic Transfer Associates, Inc. ("ETA"). (B194–95.)

Defendants followed essentially the same procedure for all the shell corporations they sold. (A148–53, B194–95.) First, they created a corporation or acquired a majority interest in an existing one and distributed its shares among friends and associates. After some time had elapsed, they submitted Form 211 filings pursuant to SEC Rule 15c2–11 for the corporation in order to register it on the NASD bulletin board. Defendants then sought a buyer for the corporation. After locating a buyer, defendants would gather the corporation's shares from their friends and associates, who in most cases had held the shares for more than two years, and

transfer ownership of the company in exchange for an agreed purchase price.

## B. The Shell Corporations

Richard Kern founded Citron in 1993 and served as its president. (A418.) Richard Kern and his wife Debra were the company's only officers and directors. (A185–86, A413.) Shortly after its incorporation Citron issued 150,000 of the five million outstanding shares to Richard and Debra Kern, and the remainder to friends and associates of the Kerns. (A147, A188, A429–32.) Donald Kern incorporated ETA in 1996. (A481.) ETA issued 1.5 million shares to Richard and Debra Kern and another half million shares to friends and associates of the Kerns. (A505–08.) Wilkins purchased 98 percent of the outstanding common stock of Polus in July 1996. (A293.) He distributed the stock as gifts to relatives, friends, and business associates, including EFI, which acquired 12,000 shares. (A305, A307, A369–76.) Wilkins appointed Scott French, an acquaintance of his son, as president. (A5, A309–10.) Debra Kern, using her maiden name Debra Martinez, served as secretary, treasurer and director. (A345.)

In 1998, defendants submitted Form 211 statements for Polus, Citron and ETA to the NASD so that the companies could be listed on the bulletin board for public trading. (A183, SA 828, A339–529.) Defendants submitted the materials for Polus and Citron in March 1998, and the companies were cleared for public trading in June. (A342, A400, A409, A467.) They filed the Form 211 statement for ETA in September 1998 and received approval for public trading on October 6, 1998. (A476, A529.)

## C. The Agreement with Lybrand

As defendants awaited approval for public trading of Polus and Citron, Lybrand contacted Thomas C. Laucks of Holladay Stock Transfer, the transfer agent for the shell corporations, and inquired if he knew of any public shell corporations for sale. (B120.) Laucks referred Lybrand to Wilkins, who in turn referred him to Richard Kern. In late May or June 1998, Lybrand spoke with Richard Kern and informed him that "he wanted to buy a shell corporation for his clients and he had a purpose that he wanted to use it for." (A166.) Richard Kern then negotiated with Lybrand, on behalf of himself, Wilkins and Donald Kern, to arrive at terms for the sale of Polus. (A167.)

Kern and Lybrand subsequently agreed that Lybrand's clients would pay $150,000 for as close to 90 percent of Polus' outstanding shares as defendants could deliver, and Lybrand's clients would have an option to buy an additional 5 or 6 percent of Polus for another $150,000. (A168.) Rather than transmitting the purchase money directly to defendants, Richard Kern and Lybrand agreed that Lybrand's investors would purchase Polus shares through the OTC bulletin board, with the money generated by such sales credited toward the $150,000 purchase price. (B23–24.)

Several weeks after beginning negotiations over Polus, Kern and Lybrand agreed on terms for the acquisition of Citron through essentially the same procedure. (A56–57, A107, A192, A197, A226.) The parties' subsequent agreement for ETA followed the same pattern, except that Lybrand agreed to pay $200,000 rather than $150,000 in the event his clients decided to acquire an additional 5 percent of ETA. (A240–41.) Unlike defendants' previous sales of shell corporations, none of the agreements to sell Polus, Citron or ETA to Lybrand was memorialized in writing. (A174–75, A242, SA881, SA951.)

## D. Collection of Shares

To acquire the promised shares for Lybrand, Wilkins and the Kerns began collecting the shares of the three shell corporations they had previously distributed among friends and relatives. (A60–64, A202.) Richard and Donald Kern collected Citron and ETA shares. (A60–64, A75–76, A202, A251.) Donald Kern testified that he purchased Citron shares for cash from shareholders "that I had a good rapport with from the past, friends, family, that I knew well and were in my travels." (A61.) In some instances the share certificates were already in the possession of the Kerns because the shareholders had never received them. (A43, A45, A48, A51–52, A69, A95–96, A116, A133, A135.) Wilkins collected Polus shares by instructing the shareholders to bring their shares to him or the transfer agent. (A300, A327.) None of the defendants informed the shareholders that the shares they were surrendering were to be sold on the public market. (A67–68, A78, A105–06, A251, A301, A327–28.) The process of collecting the outstanding shares of the three companies continued through January 1999. (A118–19; *see* A532–60.)

At Lybrand's request, Richard Kern effected ten-for-one stock splits in Polus and Citron on June 19 and July 10 respectively, increasing the outstanding number of shares from 500,000 to five million for each corporation. (A119–20, A210, A224.) These splits occurred shortly before the beginning of public trading in the companies. Richard Kern effected an identical split of ETA on his own initiative, increasing the outstanding shares from 2 million to 20 million because "I thought I had learned something in the two previous transactions and I just thought it was a good idea." (A238–39.)

## E. The Matched Orders [2]

To generate the $150,000 purchase price, defendants placed sell orders for the shell corporations' shares on the OTC bulletin board through brokerage accounts they controlled at J. Alexander Securities, Inc., including the corporate accounts of EFI, Barclay Bankcard, Canyon Vista, and Salteaux. Defendants determined the amount, price and timing of these sell orders in consultation with Lybrand. (A227–28, SA798–800, SA820, SA922.) Richard Kern testified that Lybrand instructed him to "[c]all your broker and put in a sell order and I'll make sure that somebody buys them." (SA797.) On other occasions Richard Kern would call Lybrand to report that buy orders were coming in. According to Lybrand, he and Kern would "discuss the price at which the buys came in. And then we'd determine where to sell it." (SA 925.)

Defendants made no effort to ascertain the identity of the "investors" on the other side of the transactions arranged by Lybrand. (A81–82, A104.) In fact, the initial buyers of the shell corporations' stocks were brokers, friends and acquaintances of Lybrand—including his wife and hairdresser—whom he encouraged to buy stock in the companies through telephone calls and press releases. (SA904–06.) Lybrand orchestrated the matched orders in the early days of trading in a deliberate effort to "jump start" the market in the shell companies by giving the appearance of an active trading market. (SA911–12.)

---

**2.** Matched orders are "orders for the purchase [or] sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale [or] purchase of such security." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 205 n. 25, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); 15 U.S.C. § 78i(a)(1).

Lybrand created the illusion of an active market by incrementally increasing the share prices for the matched orders. (A230.) On the first day of trading in Polus, Lybrand directed the defendants to place sell orders at $2 a share. (SA909.) On that day, EFI sold 15,500 Polus shares in three separate transactions. (*See* A563–64.) The next day, EFI sold 20,300 shares in eleven transactions at progressively higher prices. (*See* A564.) By the fifth day of trading defendants were offering the shares for $4.25 a share. (*See* A564.) Similarly, ETA shares rose from $.625 to $8.125 in the first ten days of trading through a series of matched trades involving Salteaux and Canyon Vista. (B04; *see* A684–85, A729–730.)

F.   Transfer to Lybrand's Entities

When the market sales of a corporation's shares totaled $150,000, Lybrand directed the defendants to transfer additional shares of the corporations to him by issuing share certificates to entities he designated. (A110–12, SA799.) Between June 1998 and January 1999, defendants transferred approximately 85 percent of Polus, 85 percent of Citron, and 90 percent of ETA to Lybrand's entities. (SEC Statement of Material Facts ¶ 14; *see* A530–61.) Defendants withheld some of the securities because they anticipated that the prices would go up in the public market. (A71.)

After acquiring the shares of the shell corporations Lybrand continued to manipulate the share prices through misleading press releases and wash sales of the shares among the entities he controlled.[3] (Compl. ¶¶ 47–62; SA1108.)

G.   Market Sales

The scheme was wildly successful. By January 22, 1999, the stock prices of the three corporations—none of which had any assets or revenues—had climbed to $9.50 per share for Polus, $13.75 per share for Citron, and $26.50 for ETA. (SEC Summ. J. Brief at 7.) At this time, Wilkins and the Kerns sold into the public market thousands of shares of the shell corporations that they had withheld from the transactions with Lybrand. (A71–72, A260–62; *see* A563–744.) In all, defendants realized profits of $6,029,169 as a result of their sales into the public market. (A562; *see* A563–744.)

On January 29, 1999, the SEC ordered a ten-day suspension of trading in the securities of Polus, Citron, and ETA. (A745–47.) Subsequent investigation by the SEC revealed that by February 2000 defendants had transferred most or all of the proceeds from their sales of the shell corporations' shares to various business ventures and estate planning devices. *See SEC v. Lybrand,* No. 00 Civ. 1387, 2000 WL 913894, at *2 (S.D.N.Y. July 6, 2000). Relief defendants Hannah G Irrevocable Trust and the Hannah R Trust received nearly $1 million of the trading proceeds. (SEC Statement of Material Facts ¶ 21.)

The SEC filed the complaint in this action in February 2000. Counts One and Two charge Lybrand with fraudulent and deceitful market manipulation in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a). (Compl. ¶¶ 71–76.) Count Three charges Wilkins and the Kerns with aiding and abetting Lybrand's violations of Section 10(b) and Rule 10b–5 through their participation in matched trades of the shell corporations' shares in

---

**3.** Wash sales are "transactions involving no change in beneficial ownership." *Ernst & Ernst,* 425 U.S. at 205 n. 25, 96 S.Ct. 1375; 15 U.S.C. § 78i(a)(1).

the first days of trading. (Compl. ¶¶ 77–79.) Count Four alleges that Lybrand, Wilkins, and the Kerns illegally sold restricted securities without filing the registration statements required by Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c). (Compl. ¶¶ 80–85.) Count Five charges that the two trust defendants received a portion of the illegal trading proceeds. (Compl. ¶¶ 86–88.) The complaint seeks a permanent injunction against future securities violations, disgorgement of the illegal proceeds, and other civil penalties. In July 2000, this Court granted the SEC's motion for a preliminary injunction freezing the assets of Wilkins and the Kerns, ordering an accounting from them and the two trusts, and prohibiting the destruction of documents. *See Lybrand,* 2000 WL 913894 at *12–*13.

On the same day the SEC filed its civil complaint, the U.S. Attorney for the Southern District of New York filed criminal charges against Lybrand for his role in the trades in Polus, Citron and ETA. In October 2000, Lybrand pleaded guilty to securities fraud, perjury, obstruction of justice, and false statements to government officials. (SA1090–1118.) In March 2001 he was sentenced to 87 months' imprisonment. (SA1119–39.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ... and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen,* 64 F.3d at 79 (quoting *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts to show there is a factual question that must be resolved at trial. *See* Fed.R.Civ.P. 56(e); *see also Legal Aid Soc'y. v. City of New York,* 114 F.Supp.2d 204, 213 (S.D.N.Y.2000). A non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). In short, a nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Section 5 Claim

Section 5 of the Securities Act prohibits the sale of securities in interstate commerce unless the issuer has filed a Form S–1 Registration Statement with the SEC. Section 5 provides:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly -
>
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a). The purpose of the registration requirement, and of the Securities Act as a whole, is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). Section 5 requires issuers of securities to disclose "information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered." *SEC v. Cavanagh*, 1 F.Supp.2d 337, 360 (S.D.N.Y.) (citing 15 U.S.C. §§ 77g, 77aa), *aff'd*, 155 F.3d 129 (2d Cir.1998).

■ To establish a prima facie case that defendants violated Section 5, the SEC must prove three elements: "first, that no registration statement was in effect as to the securities; second, that the defendant[s] sold or offered to sell these securities; third, that there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale." *Cavanagh*, 1 F.Supp.2d at 361 (citing *Neuwirth Investment Fund, Ltd. v. Swanton*, 422 F.Supp. 1187, 1193 n. 8 (S.D.N.Y.1975)). The SEC is not required to prove scienter. *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 859–60 (S.D.N.Y.1997) (citing *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir.1976)), *aff'd*, 159 F.3d 1348 (2d Cir.1998). Once the SEC makes out a prima facie case, defendants bear the burden of showing that the securities sold were exempt from the registration requirement. *Ralston Purina Co.*, 346 U.S. at 126, 73 S.Ct. 981; *Lybrand*, 2000 WL 913894 at *10.

The SEC has established a prima facie case. It is undisputed that none of the three corporations ever filed a registration statement, and shares of all three corporations were traded in interstate commerce over the NASD bulletin board. (A212–14, A225, A254.) The SEC argues that it is entitled to summary judgment on the Section 5 claim because defendants will not be able to sustain their burden of proving that they were exempt from Section 5's registration requirement.

■ Defendants respond that summary judgment is inappropriate because of disputed issues of material fact as to their eligibility for the exemption provided by Section 4(1) of the Securities Act, 15 U.S.C. § 77d(1). Section 4(1) excludes from the registration requirement "transactions by any person other than an issuer, underwriter or dealer." Defendants claim that they were not "underwriters" with respect to Polus, Citron and ETA because at all times they viewed their transactions with Lybrand as private sales, not public distributions. In support of their claim, defendants further argue that they "substantially complied" with the requirements of Rule 144, 17 C.F.R. § 230.144, with regard to sales made in the first 90 days of trading and fully complied with Rule 144(k) with regard to sales made thereafter.

a. Section 4(1)

As noted above, defendants contend that disputed issues of fact exist as to whether they were "underwriters" for the purposes of the Section 4(1) exemption. Section 2(11) of the Securities Act defines an "underwriter" as:

any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect partic-

ipation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking .... As used in this paragraph, the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C. § 77b(a)(11). Thus, securities holders may be considered "underwriters" and thus ineligible for the Section 4(1) exemption if they either 1) purchase securities from an issuer "with a view to" offering the securities in a distribution or 2) sell securities "for an issuer in connection with" a distribution. *See Ackerberg v. Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989). A "distribution" is equivalent to a public offering of securities. *Id.*

■ Congress enacted a broad definition of underwriter status in order to "include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public." Thomas Lee Hazen, *The Law of Securities Regulation* 431 (4th Ed.2002). The Section 4(1) exemption is intended to "exempt only trading transactions between individual investors with respect to securities already issued and not to exempt distributions by issuers or the acts of individuals who engage in steps necessary to such distributions." *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir.1959) (citing *SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir.1941)). A control person, such as an officer, director, or majority shareholder, is "treated as an issuer when there is a distribution of securities" and therefore "ordinarily may not rely upon the Section 4(1) exemption." *Cavanagh*, 155 F.3d at 134 (citing *United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir.1968)).

Defendants argue that they conceived of their transactions with Lybrand as private sales rather than public distributions of the shell corporations, and therefore they did not acquire the shell corporations' shares "with a view to" distribution. They do not, however, dispute that they acquired the shares with the intention of transferring them to Lybrand, in part through sales on the OTC bulletin board. Defendants have not adduced any evidence that these public sales should not be considered a "distribution" within the meaning of the Securities Act. Moreover, defendants ignore the fact that Section 2(11) is written in the disjunctive. *See* 15 U.S.C. § 77b(a)(11); 17 C.F.R. § 230.144, Preliminary Note. Their mental state at the time they acquired the shell corporations' shares is therefore not dispositive; they may still be considered underwriters if they sold shares "for an issuer in connection with" a public distribution of securities. Defendants fail to address this prong of the underwriter definition entirely, instead arguing that they fall within the Rule 144 safe harbor. The Court now turns to that issue.

b. Rule 144

The SEC promulgated Rule 144 to clarify the statutory definition of "underwriter" for the purposes of the Section 4(1) exemption. The rule provides that an individual who sells restricted shares will not be considered an underwriter or involved in a distribution if the following conditions are met: adequate current public information is available concerning the issuer; the restricted securities have been held at least one year; no more than 1 percent of outstanding shares are being sold within a three-month period; the shares are sold as "brokers' transactions" within the meaning of Section 4(4) of the Securities Act; and if the amount of securities sold in any three-month period exceeds 500 shares or has an

aggregate price in excess of $10,000, notice of such proposed sales has been given to the SEC. *See* 17 C.F.R. § 230.144(c)-(f),(h). The above requirements do not apply if the seller has not been an affiliate of the issuer for the preceding three months and a period of at least two years has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer. *See* 17 C.F.R. § 230.144(k).

In granting the SEC's preliminary injunction motion, the Court found that defendants' sales of the shell corporations' securities failed to meet any of the requirements of the Rule 144 safe harbor. The unregistered sales to Lybrand did not qualify because at the time of the sales defendants were affiliates of the shell corporations, the sales were for over 80 percent of each issuer, the sales were not conducted through "brokers' transactions" and no notice of the proposed sales was filed with the SEC. *Lybrand,* 2000 WL 913894 at *11. The unregistered sales to the public failed to satisfy the one-year holding requirement of 17 C.F.R. § 230.144(d)(1) since the defendants had acquired the shares from affiliates of the issuer between June 1998 and January 1999 and resold the shares during the same period. *Id.* Finally, defendants could not rely on Rule 144(k) because they "remained affiliates within three months of the final transactions in January 1999" and because the securities had not been held for the requisite two-year period. *Id.*

In the face of this formidable evidence against them, defendants advance two arguments. First, defendants contend that, with respect to shares sold within 90 days of the respective sale agreements with Lybrand, they "substantially complied" with Rule 144, and this compliance is evidence that they did not acquire the shares "with a view to" distribution and therefore

are not "underwriters" within the meaning of Section 4(1). Defendants' "substantial compliance" argument relies on the following premises: 1) in the instant they agreed to turn over the shell corporations to Lybrand, defendants ceased being affiliates or control persons; 2) they are entitled to tack on the holding period of the original shareholders to meet the one-year holding requirement; and 3) the number of shares sold during the first 90 days after their agreements with Lybrand, while slightly higher than the 1 percent limit set by Rule 144, is sufficiently limited to satisfy the purposes of Section 4(1). Alternately, defendants contend that they ceased being affiliates or control persons of Polus, Citron, and ETA when Lybrand gained a majority of shares in the corporations, and the shares transferred in the 90 days after this date amounted to less than 1 percent of outstanding shares, bringing them into substantial compliance with Rule 144 with respect to these transactions.

Defendants' "substantial compliance" argument is nothing more than an extension of their claim that they did not acquire the shell corporations' securities "with a view to" participating in a distribution. Since the Court has already concluded that the alleged dispute over defendants' mental state cannot defeat the SEC's motion for summary judgment, it need not examine the merits of the defendants' claims that their transactions involving the shell corporations amounted to "substantial compliance" with Rule 144.

Second, defendants argue that they are entitled to rely on the Rule 144(k) exemption for sales made more than three months after Lybrand gained control of Polus, Citron, and ETA. As noted above, to qualify for the protection of Rule 144(k), defendants must establish that at the time they sold the corporations' shares they had not been affiliates of the issuer for the

preceding three months and a period of at least two years had elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer. *See* 17 C.F.R. § 230.144(k). Defendants claim that they meet the first requirement because they ceased being affiliates when they resigned as officers and directors of the corporations, or, alternately, when Lybrand gained a majority of shares. They argue that they meet the second prong because the original shareholders were not affiliates of the shell corporations. Both contentions are wrong.

### i) Defendants Were Affiliates of the Shell Corporations

■ Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, [an] issuer." 17 C.F.R. § 230.144(a)(1). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. The determination of whether a person occupies a "control" position does not turn upon a single factor such as stock ownership, but rather "depends upon the totality of the circumstances, including an appraisal of the influence the individual has on the management and policies of a company." *Cavanagh,* 1 F.Supp.2d at 366 (citing *United States v. Corr,* 543 F.2d 1042, 1050 (2d Cir.1976)). For the purposes of Section 5's registration requirements, courts have looked to whether the person in question is " 'in a position to obtain the required signatures of the issuer and its officers and directors on a registration statement.' " *Id.* at 362 (quoting Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 247 (3d ed.1995)). *See also SEC v. American Beryllium & Oil Corp.,* 303 F.Supp. 912, 915 (S.D.N.Y.1969).

The defendants in *Cavanagh* contended that they were exempt from Section 5's requirements because they sold the unregistered shares at issue shortly after entering into a merger agreement on behalf of the company. The court determined that the merger and the sale of shares should be viewed through an "integrated" analysis, since the evidence supported a finding that the merger and sales constituted a single transaction, both in the minds of the parties and in terms of the effect on the investing public. *See Cavanagh,* 1 F.Supp.2d at 363–66. " 'The concept of "integrating" offerings is intended to prevent an issuer from avoiding registration by structuring a transaction in two or more apparently exempt offerings ... when they actually should be considered a single nonexempt transaction.' " *Id.* at 363 (quoting Loss and Seligman, *supra,* at 278). Applying this "integrated" analysis, the District Court found that even if at the time they sold the shares the defendants had resigned as officers and directors and no longer controlled a majority of shares, they were still control persons for the purposes of Section 5. *Id.* at 366–67.

The Kerns and Wilkins first argue that they ceased being affiliates of the shell corporations on the dates they resigned as officers and directors of the corporations, namely June 22, 1998 for Polus, June 13, 1998 for Citron, and November 6, 1998 for ETA. (Def. Rule 56.1(a) Statement ¶¶ 6, 18, 30.) These dates roughly coincide with the first day of trading in each corporation. Alternately, defendants contend that they were no longer affiliates by the time they had transferred a majority of shares to Lybrand, since at that time Lybrand was effectively in control of the companies. They claim that this occurred on July 14, 1998 for Polus and August 18, 1998 for

Citron. (Def. Rule 56.1(a) Statement ¶¶ 11, 24.) Therefore, sales of Polus made after October 14, 1998, and sales of Citron made after November 18, 1998 complied with Rule 144(k) and defendants were not required to file registration statements in connection with these sales. Defendants concede that this argument does not apply to ETA, since defendants controlled approximately 80 percent of the outstanding stock up until the period from November 17, 1998 to November 23, 1998, when they transferred nearly 17 million shares to Lybrand. (*See* A553–54.)

Defendants' attempts to distance themselves from Polus, Citron and ETA are unavailing. Their agreements with Lybrand provided that the sale of each corporation was to be effected through the initial sale of shares on the OTC bulletin board and the subsequent transfer of shares to Lybrand's entities. Applying the principles set forth in *Cavanagh*, the sales and transfer should be viewed as part of a single transaction for each entity, and since the transfer of shares in each corporation continued through January 1999, defendants were still affiliates at that time. (*See* A540, A549, A560.) In addition, defendants continued to make policy decisions on behalf of the companies even after transferring a majority of shares to Lybrand. Richard Kern signed a merger agreement as president of Citron in January 1999. (A200.)

Moreover, "[t]o accept [defendants'] argument that the literal transfer of majority ownership constitutes the moment at which a former affiliate may sell freely into the market is to ignore the guiding purpose of the Securities Act—the protection of 'those who do not know market conditions from the overreachings of those who do,'" *Cavanagh*, 1 F.Supp.2d at 366 (quoting *Charles Hughes & Co. v. SEC*, 139 F.2d 434, 437 (2d Cir.1943)). In January

1999, defendants sold thousands of shares of the shell corporations' stock at prices which had been set in large part through defendants' participation in a series of matched orders with Lybrand's entities. The investors purchasing these shares had no access to information about the agreements with Lybrand or the nature of these early transactions. The evidence clearly indicates that, as the Court found in the preliminary injunction decision, defendants remained affiliates at the time of their sales in January. *Lybrand*, 2000 WL 913894 at *11. Their contention that they were no longer affiliates 90 days prior to these sales must therefore fail.

ii) The Original Shareholders Were Affiliates

■ Nor can defendants tack on the holding period of the original shareholders in order to meet Rule 144(k)'s two-year holding requirement on the grounds that the original shareholders were not affiliates of the shell corporations. All of the shareholders in the three shell corporations were family members, friends, acquaintances and associates of Wilkins and the Kerns. The corporations failed to observe corporate formalities. No directors' or shareholders' meetings ever took place, and on several occasions defendants invented minutes for imaginary meetings and forged the signatures of the officers. (A13–14, A243–46, A270, A336.) Polus' nominal president, Scott French, testified that he knew nothing about Polus' business or the pending sale to Lybrand, had never attended any shareholder or board meetings, and his only duty as president was "to sign documents from time to time." (A3–10, A4.) At the time of their agreements with Lybrand, the defendants owned approximately 2 percent of the outstanding shares of Polus, 30 percent of Citron and 78 percent of ETA. (SEC Statement of Material Facts ¶ 14; A203–

04, A237; *see* A369–76, A429–32, A505–08.) Yet they were sufficiently confident of their control over the shell corporations that they promised to deliver 90 to 95 percent of each. Defendants claim that the fact that they ultimately transferred slightly less than this amount to Lybrand indicates that they lacked control over the shareholders, but this contention carries little weight in the absence of evidence that these shareholders played any role in the shell corporations' affairs whatsoever.

Since defendants remained affiliates within 90 days of the final transactions in the shell corporations' shares and since the original shareholders were affiliates of the corporations, defendants do not qualify for the Rule 144(k) exemption.

Finally, it is worth noting that the purpose of Rule 144 is to provide clear guidelines to investors who wish to trade restricted securities, not to serve as a springboard for convoluted *post hoc* arguments by affiliates seeking to justify an impermissible transaction. In interpreting exemptions to Section 5, courts look to the statutory purpose of promoting adequate disclosure to the investing public, "rather than engage in strangulating literalism." *SEC v. Harwyn Indus. Corp.*, 326 F.Supp. 943, 954 (S.D.N.Y.1971). Thus, as with any safe harbor provision, "technical compliance" with Rule 144 will not protect sellers of a security if such compliance is part of a scheme to evade the Securities Act's registration requirements. *See* Hazen, *supra*, at 450.

The SEC addressed this very issue with respect to transactions similar to those under discussion here in two no-action letters issued in 1999 and 2000. In *Harmony Trading Corp.*, SEC No–Action Letter 1999 WL 1059812 (Nov. 22, 1999), a shell corporation transferred shares to a large number of individuals shortly before obtaining permission for public trading. The SEC warned that "[i]n situations of this kind, resales of such securities in claimed reliance on rule 144 raise questions whether the transfers involve an evasive scheme to avoid registration under the Securities Act of 1933." *Id.* at *7. In a second no-action letter responding to an inquiry from the NASD's OTC Compliance Unit, the SEC wrote that neither Section 4(1) nor Rule 144 would apply to situations in which stock promoters sought to sell the unregistered shares of shell corporations after the lapse of some period of time following the issuance of shares to other persons. *NASD Regulation, Inc.*, SEC No–Action Letter 2000 WL 64968 (Jan. 21, 2000). Emphasizing that purchasers who are "mere conduits" for a wider distribution of securities are not eligible for the Section 4(1) exemption, the SEC concluded that "the promoters or affiliates of the [shell] companies as well as their transferees, are 'underwriters' of the securities issued." *Id.* at *3. Sellers of the securities could not rely on Rule 144, "regardless of technical compliance with that rule, because these resale transactions appear to be designed to distribute or redistribute securities to the public without compliance with the registration requirements of the Securities Act." *Id.* Defendants incorrectly argue that since the SEC's no-action letters had not issued at the time they entered into their arrangements with Lybrand, the transactions were legal. The SEC's no-action letters do not change the substantive law and are not binding on courts, though they may be treated as persuasive. *See New York City Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 13 (2d Cir.1995).

In sum, defendants' transactions fall squarely within the ambit of Section 5 and are not entitled to exemption pursuant to Section 4(1) or Rule 144. Defendants have not identified any factual issues that would

allow them to prove that they did not sell shares in Polus, ETA, and Citron "for an issuer in connection with" a public distribution. They created or controlled each of the shell corporations, secured their listings on the OTC bulletin board and sold their shares into the public market without filing a registration statement. They acquired the shares from the original shareholders pursuant to their agreements with Lybrand and sold them on the bulletin board in a series of matched trades that artificially inflated the price of the stock. Neither the original shareholders nor the investors who purchased the shares on the bulletin board had access to information regarding defendants' agreements with Lybrand and their effect on the share price of the securities. Defendants reaped profits of millions of dollars from their public sales. It is precisely this type of conduct that the registration requirement aims to prevent.

The SEC's motion for summary judgment against defendants Richard Kern, Donald Kern, Charles Wilkins, EFI Corp., Barclay Bankcard, Inc., Canyon Vista Corp., and Salteaux Ltd. is therefore granted.

### C. Relief Defendants

■ Summary judgment is also appropriate against the Hannah G Irrevocable Trust and the Hannah R Trust, which received almost $1 million of defendants' illegal trading proceeds. A court may order "equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Cavanagh*, 155 F.3d at 136. Defendants do not dispute that the relief defendants received a portion of their profits from the trades in Citron, ETA, and Polus. Since these trades violated the Se-

curities Act's registration provisions, the trusts do not have a legitimate claim to these funds. The SEC's motion for summary judgment against the two trusts is granted.

### D. Aiding and Abetting Claim

Section 10(b) of the Exchange Act forbids the use of manipulative or deceptive devices in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j(b). Rule 10b–5, promulgated pursuant to Section 10(b), provides that it is unlawful

> (a) To employ any device, scheme or artifice to defraud, . . . or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Section 104 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") authorizes the SEC to seek injunctive relief against parties who aid and abet primary violations of certain provisions of the securities laws, including Section 10(b) and Rule 10b–5. Section 104 provides:

> (e) For purposes of any action brought by the Commission under paragraph (1) or (3) of Section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e). Congress passed Section 104 to clarify that the SEC retained the authority to bring such actions after the U.S. Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177–78, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), held

that private civil liability for Section 10(b) violations ·extended to primary violators only. *See SEC v. Fehn,* 97 F.3d 1276, 1282 (9th Cir.1996). Courts applying Section 104 have generally analyzed the provision in light of pre-*Central Bank* aiding and abetting case law. *See id.* at 1286; *Graham v. SEC,* 222 F.3d 994, 1000 (D.C.Cir. 2000).

█ An individual may be liable for aiding and abetting a securities violation where there is "(1) a primary violation by another party; (2) knowledge of the violation by the aider and abettor and (3) substantial assistance by the aider and abettor." *In re Gas Reclamation, Inc. Sec. Litig.,* 733 F.Supp. 713, 720 (S.D.N.Y.1990) (citing *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980)). Defendants maintain that they are entitled to summary judgment because the SEC cannot establish that they had actual knowledge of Lybrand's stock manipulation scheme or that they substantially assisted the violations. The SEC counters that there is ample evidence in the record from which a jury could conclude that defendants "knew, or were generally aware, of their roles in Lybrand's matched transactions, and knowingly or recklessly rendered substantial assistance in the manipulation." (SEC Opp. Brief at 4.)

1. Primary Violation and Substantial Assistance

█ There is no question that Lybrand committed primary violations of the securities laws. Lybrand pleaded guilty to, and was convicted of, manipulating the markets for Polus, Citron and ETA securities in violation of Section 10(b) and Rule 10b–5. His manipulation included the place-

ment of matched orders. In his plea allocution, Lybrand admitted that

> at my direction, people who I knew purchased shares of each stock at manipulated prices I determined, again giving the false impression of increased interest in the stock. I did this intentionally to fraudulently induce investors to purchase these stocks, so that I could unlawfully profit.

(SA 1108.) Defendants were on the other side of these transactions.

Defendants provide no support for the assertion that their placement of coordinated sell orders did not "substantially assist" Lybrand's manipulation of the market. Defendants placed at least 51 directed trades in the shell corporations at Lybrand's behest.[4] They also effectuated a stock split for each of the corporations shortly before public trading began. The coordinated orders caused the share prices of the corporations to rise dramatically in the first days of trading. Since no prior market existed in the corporations' shares, defendants' participation in the matched orders helped to establish inflated prices for the securities that appeared to outside observers to be the result of market forces. The SEC has produced more than enough evidence to withstand defendants' summary judgment motion on the primary violation and substantial assistance elements of the aiding and abetting claim.

2. Scienter

█ The parties disagree on the necessary level of scienter to sustain a Rule 10b–5 aiding and abetting claim. Defendants contend that the SEC will have to establish that they had actual knowledge that Lybrand intended to manipulate the

---

4. While Richard Kern and Wilkins effected the actual sales (A216–17, ˙A227), Donald Kern acted in a partnership relationship with Richard Kern and Wilkins and played a significant role in acquiring the shares of Citron and ETA that were used in the matched orders. (A145–46, A266, SA784–85, SA788.)

market, while the SEC maintains that it need only prove that defendants acted with recklessness with respect to Lybrand's violations.

Section 104 of the PSLRA provides that the aider and abettor must "knowingly" provide substantial assistance to the primary violator but does not define "knowingly." *See SEC v. Moskowitz*, No. 97 Civ. 7174, 1998 WL 524903, at *3 (S.D.N.Y. Aug. 20, 1998) (declining to decide whether recklessness or actual knowledge required). In this circuit, it is well-established that recklessness satisfies the scienter requirement for aider and abettor liability when the alleged aider and abettor owes a fiduciary duty to the defrauded party. *See, e.g., Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir.1990); *IIT*, 619 F.2d at 923. Generally, where there is no fiduciary relationship, "the scienter requirement scales upward—the assistance rendered must be knowing and substantial." *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 491 (S.D.N.Y.1989) (citations omitted), *aff'd*, 969 F.2d 15 (2d Cir.1992). Courts in this district have also held that recklessness satisfies the scienter requirement where the plaintiffs were third parties whose reliance on the defendant's fraudulent conduct was foreseeable or where the defendant owed a duty of disclosure to the defrauded party. *See In re Leslie Fay Cos., Inc. Sec. Litig.*, 835 F.Supp. 167, 175 (S.D.N.Y.1993); *In re Gas Reclamation*, 733 F.Supp. at 720.

The SEC contends that recklessness meets the scienter requirement here. First, the SEC claims that defendants, as corporate insiders, owed a fiduciary duty to shareholders in the shell corporations. *See O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1184–85 (S.D.N.Y.1981). Second, in *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 108 (2d Cir.1998), the U.S. Court of Appeals for the Second Circuit held that a broker could be directly liable for violating Section 10(b) when he followed a stock promoter's directions in executing trades that he knew, or was reckless in not knowing, were matched orders, even if he did not share the promoter's overall objective to manipulate the market for the stock. The broker's placement of matched orders fell "well within the bounds of primary liability," despite "the fact that someone else directed the market manipulation scheme." *Id.* at 111, 112. The court further observed that the broker might alternately be liable under the aiding and abetting provisions of the PSLRA. *Id.* at 113.

While the SEC's arguments are compelling, the Court need not resolve the scienter issue here. Even adopting the more demanding scienter standard urged by defendants, there is sufficient evidence from which a jury could conclude that the defendants had actual knowledge that the sell orders orchestrated by Lybrand were intended to manipulate the market. In his deposition Lybrand was asked if he ever said anything to Richard Kern that indicated that Lybrand was manipulating the market for the shell corporations' securities. (SA986–88.) Lybrand responded that when ETA began trading in November 1998, "the first few days when the stock was going up [Richard Kern] questioned like why are you taking it up so fast." (SA988.)

In addition, there is ample circumstantial evidence that could give rise to an inference of actual knowledge of Lybrand's manipulative intent. *See Moskowitz*, 1998 WL 524903 at *3. Unlike their previous merger transactions, defendants made no written agreement with Lybrand. The share prices directed by Lybrand steadily increased. The sell orders placed by defendants in the early days of trading were all limit orders, which meant that the shares could only be sold at the quoted

price or higher. (SA762–63.) The prices at which defendants were selling the shares on the public market were considerably higher than the price per share they were receiving for selling 90 percent of the companies. (SA955–57.)[5] Defendants withheld a substantial number of shares from the transactions with Lybrand that they later sold into the market at greatly inflated prices.

While defendants maintain that the general public could not view which shares were being traded on the OTC bulletin board, defendants knew that anyone in the United States could trade on the bulletin board and the going prices for the shell corporations could be viewed by anyone who knew the trading symbol. Richard Kern testified that he was aware that anyone who knew the stock symbols for the corporations could see the price at which the shares were trading and that the sales were "there for the world to see what was going on." (SA796, SA839–40.) Donald Kern testified that he could access the current trading price of Citron by typing its trading symbol into America Online. (SA792.) Wilkins was also aware that anyone who had access to the bulletin board could view the prices of the shell corporations' shares. (SA1040–41.) A jury could conclude that the defendants knew that the steadily increasing share prices and matching sell orders orchestrated by Lybrand were intended to drive up the price of the shell corporations' stock. Thus, defendants are not entitled to summary judgment in their favor on the SEC's claim that they aided and abetted primary violations of the securities laws.

## III. CONCLUSION

Because defendants have not come forward with a triable issue of fact that would

prove their public sales of Polus, Citron and ETA securities were exempt from Section 5's registration requirement, the SEC's motion for summary judgment against defendants Richard Kern, Donald Kern, Charles Wilkins, EFI Corp., Barclay Bankcard, Inc., Canyon Vista Corp., and Salteaux Ltd. is granted. Summary judgment is also granted against relief defendants Hannah G Irrevocable Trust and Hannah R Trust since it is undisputed that the trusts received a portion of the proceeds from the illegal trades. Defendants' motion for summary judgment on the aiding and abetting claim is denied because there are issues of fact as to whether defendants knew of Lybrand's scheme to manipulate the market.

SO ORDERED.

---

5. For example, on November 23, 1998, the publicly quoted price for ETA stock was $7.46 per share. The terms of defendants' agreement with Lybrand provided that they would receive approximately $.008 per share for delivering 90 percent of ETA. (SA957.)