**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Emanuel PINEZ, Defendant,**

**Felix, Inc., and Lehman Brothers, Inc., Relief Defendants,**

**Gilboa Peretz, and P.G. Technologies, Respondents.**

**No. Civ.A. 97–10353–PBS.**

United States District Court,
D. Massachusetts.

May 25, 1999.

---

Stuart P. Feldman, Carlos Costa–Rodriques, Linda Bridgeman, Securities and Exchange Commission, Boston, MA, John M. D'Amico, Juan Macel Marcelino, Grant David Ward, Securities & Exchange Commission, Boston, MA, Kimberly M. Zimmer, Boston, MA, Jeffrey W. Kobrick, U.S. Securities and Exchange Commission, San Francisco, CA, for Securities and Exchange Commission, plaintiff.

Francis J. DiMento, DiMento & Sullivan, Boston, MA, Kimberly M. Zimmer, Boston, MA, for P.G. Technologies, Intervenor–Plaintiff.

Valerie S. Carter, Law Office of Valerie Carter, Boston,. MA, for Emanuel Pinez, defendant.

John C. Bartenstein, Robert K. Gad, Mark Szpak, Ropes & Gray, Boston, MA, for Lehman Brothers, defendant.

John J. Falvey, Jr., United States Attorney's Office, Boston, MA, for United States of America, interpleader.

James B. Adelman, Choate, Hall & Stewart, Boston, MA, for Paine Webber, Inc., interested party.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, for Centennial Technologies Inc., Special Committee of the Board of Directors, interested party.

Robert L. Ullman, Nutter, McClennen & Fish, Boston, MA, for Nutter, McClennen & Fish, interested party.

Vincent M. Amoroso, Robert A. McCall, Peabody & Arnold LLP, Boston, MA, Sarah R. Wolff, Sachnoff & Weaver, Chicago, IL, for Greg Goldsmith, Craig Anderson, Robert Wasserman, Timothy Werner and Lakota Trading, interested parties.

Glen DeValerio, Norman Berman, Matthew Miller, Berman, DeValerio & Pease, Boston, MA, for Investors in Centennial Technologies, Inc., interested party.

Dennis M. Kelleher, Thomas J. Dougherty, Skadden, Arps, Slate, Meagher &

Flom, Boston, MA, for Coopers & Lybrand, Partnership, interested party.

Marilyn D. Stempler, Andrew P. Strehle, Andrew Strehle, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Felix, Inc., interested party.

Francis J. DiMento, DiMento & Sullivan, Boston, MA, for Gilboa Peretz, interested party.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

Plaintiff, Securities and Exchange Commission ("SEC"), has moved for an order holding respondents, Gilboa Peretz ("Peretz") and PG Technologies, Inc. ("PGT"), in civil contempt, for making intentionally false and misleading statements during a February 24, 1997, hearing before this court. After an evidentiary hearing, this Court holds respondents in civil contempt and orders the entry of judgment in the agreed-upon amount of $15,000.00.

### II. *Factual Background*

This action arises out of the alleged illegal insider trading practices of the former Chairman and Chief Executive Officer of Centennial Technologies, Inc. ("Centennial"), Emanuel Pinez ("Pinez"). On February 14, 1997, the Securities and Exchange Commission ("SEC") filed a complaint against Pinez, alleging that he traded in options on the common stock of Centennial while in possession of material, nonpublic information regarding Centennial's true financial condition in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, and section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77q(a). The SEC's complaint, and its accompanying ex parte motion for a temporary restraining order, requested that Pinez be restrained from

committing further acts of securities fraud, and that any and all assets that are "in the name of, in the custody of, held for the benefit of, or subject to the control of" Pinez be frozen to prevent dissipation. This Court froze the assets in several accounts alleged to be under defendant Pinez's direct or indirect control.[1] Specifically, on February 14, 1997, this Court placed a freeze order on "any funds or other assets in the name, for the benefit, or under the direct or indirect control of [Mr. Pinez]."

Upon receiving the Asset Freeze Order, BayBank, N.A. froze PGT's account. Under the terms of that account, Pinez had some degree of control over the account because he was required to sign his name on any withdrawal over $5,000. On the date of the freeze order, the account contained $30,215.58. For reasons that are unclear in the record, PGT was not informed that the freeze order was put into effect, and it continued to write checks for a period of time.

On February 24, 1997, PGT filed a motion to modify the Asset Freeze Order because it stated it needed the funds to make its payroll and pay expenses in the ordinary course of business. Peretz, who was represented by counsel, testified in support of the motion. The SEC had refused to consent because it was unpersuaded that "none of this $30,000 is Mr. Pinez's money." (Tr. 26, ln.9). By the date of the hearing, Peretz had written over $15,000 in checks. In an effort to ascertain whether the funds remaining in a PGT bank account were tainted, the Court asked Peretz a series of direct questions:

> The Court: Is any of the remaining $14,000, does any of it belong to Mr. Pinez?
>
> The Witness: No.
>
> The Court: Where is it from?
>
> The Witness: From sales that we made.

---

1. For the background of the enforcement action, *see Securities and Exchange Commission*

*v. Lehman Brothers, Inc.,* 157 F.3d 2 (1st Cir.1998).

(Tr. 29, lns.5–9). Later, while being cross-examined by counsel for the SEC, Peretz admitted that Pinez had invested $400,000 in PGT, in early 1996, in exchange for shares. When asked if some of this $400,000 investment still remained in the account, Peretz responded: "The original $400,000 was long gone. We are running a lot of projects, a lot of developments, and we already spent this money." (Tr. 30, lns.10–12).

The court later followed up on its earlier line of questioning:

> The Court: But you're telling me under oath that all $400,000 is gone and that [the remaining amount of funds in the account] comes from weekly sales?

> The Witness: Not weekly. When we do sales, we do time to time and we do— it's a few tens of thousands of dollars. It's not retail sales.

(Tr. 33, lns.2–7). Based on Peretz's sworn testimony, over the objection of the SEC, the Court dissolved the asset freeze order as to PGT. PGT spent all the money that had been frozen in the account. It is no longer a viable company.

On November 26, 1997, the SEC issued an investigative subpoena *ad testifican-dum* to Peretz. In January of 1998, Peretz invoked his Fifth Amendment right against self-incrimination when he was queried, under oath, by the SEC about the truthfulness of his testimony before this Court regarding the source of the frozen funds in the BayBank account.

In September of 1998, after learning more about the relationship between Pinez and the funds in PGT's account at the time of the February 24, 1997 hearing, the SEC moved this Court to hold a contempt hearing regarding Peretz's testimony. A hearing on the order to show cause was scheduled for November 18, 1998. However, because Peretz, who had moved to New York City to get consulting work, was not present at the hearing, it was continued until January 8, 1999. On that date, Peretz testified primarily about his dire financial condition.

The SEC submitted persuasive documentary evidence that Peretz intentionally misled this Court during the February 24, 1997, hearing, for example, PGT's Register of Financial Transactions (Exhibit 5), PGT's January, 1997, Bank Statement (Exhibit 12), and a January, 1997, cancelled check for $100,000 from Pinez to PGT (Exhibit 15). These exhibits support the conclusion that most of the funds in the account in January and February, 1997, derived from Centennial/Pinez and not from sales that PGT had made. PGT's account balance at BayBank on January 1, 1997, was $23,321.58. On January 8, 1997, Pinez provided $100,000 to PGT by a check drawn on Pinez's account at PaineWebber. On the following day, BayBank credited $100,000 to PGT's account. Other than Pinez's check for $100,000, PGT did not make any significant deposits to its BayBank account during January, 1997. However, during January, 1997, PGT spent $73,031.21. During February, 1997, there were no deposits or credits to PGT's account. On the date of the freeze order, February 14, 1997, $30,215.58 was in the account. As defendant concedes, under the best case scenario, at least $8,266.88 ($30,215.58—$23,321.58) in the account on February 14, 1997 can be attributed to the intervening deposit by Pinez. Because the funds were commingled, any attempt to argue that the remaining $14,000 came from the initial $23,000 in the account at the start of January would be futile.

The $100,000 check from Pinez to PGT was one of many. The SEC calculates that Pinez provided $795,000 to PGT during the period April 30, 1996, to January 9, 1997. Separately, Centennial also provided $496,500 to PGT in April, 1996, in exchange for a $100,000 promissory note from PGT and PGT stock for $396,500.

In May, 1997, PGT entered into a "settlement agreement" with Centennial. The agreement, signed by Peretz, recounts that, at the instruction of Pinez, PGT issued purchase orders to Centennial in No-

vember, 1996, for products that PGT did not need, at a purported cost to PGT of $500,000. Centennial thereafter shipped "blank," or bogus, computer cards to PGT, and indicated that its shipment constituted "satisfaction" of PGT's purchase orders. Additionally, in December, 1996, PGT made "full payment" for the bogus computer cards with $500,000 provided by Pinez from his personal account. PGT's check to Centennial in payment for the computer cards was signed by both Peretz and Pinez and drawn on the BayBank account subsequently frozen by this Court on February 14, 1997.

Peretz, through his counsel, claimed that when he testified that the funds were "from sales that he made," he meant the sale of PGT stock to Pinez as an investment. That interpretation strains credibility in light of the colloquy quoted above, which expressly distinguished between funds provided by Pinez for investment purposes and those derived from sales. Counsel also attempts to explain the misleading testimony by stating that Peretz, an Israeli, had a lack of proficiency in the English language. While Peretz did have a thick accent, he never requested an interpreter at the hearing and responded appropriately at both hearings. I do not attribute the misleading testimony to a language barrier. I find that Peretz gave intentionally false and misleading testimony about the source of the money in the BayBank account in order to interrupt and interfere with the Court's efforts to freeze Pinez' assets for the benefit of defrauded investors in Centennial. The Court would not have released the funds if it had been made aware of Pinez's involvement in PGT, particularly the January check for $100,000.

### III. *Discussion*

█ Federal courts have the inherent power to impose submission to their lawful mandates and to achieve the orderly disposition of cases. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). For example, "[a]

court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Id.* at 44, 111 S.Ct. 2123.

Courts have also rested the civil contempt power upon 18 U.S.C. § 401. Although 18 U.S.C. § 401 is a criminal statute, and, by its terms, gives federal courts the "power to punish," many courts have relied upon the statute as authority for civil contempt as well. *See, e.g., Coleman v. Espy,* 986 F.2d 1184, 1190 (8th Cir.1993) (citing *United States v. Barco Corp.,* 430 F.2d 998, 1000 (8th Cir.1970)); *In re Jaques,* 761 F.2d 302, 305 (6th Cir.1985); *KSM Fastening Sys., Inc. v. H.A. Jones Co.,* 776 F.2d 1522, 1525 n. 3 (Fed.Cir. 1985); *Petties v. District of Columbia,* 897 F.Supp. 626, 629 (D.D.C.1995); *Wella Corp. v. Wella Graphics, Inc.,* 874 F.Supp. 54, 56 (E.D.N.Y.1994); *cf. United States v. Horn,* 29 F.3d 754, 765 n. 13 (1st Cir. 1994) (discussing "fines for civil contempt under 18 U.S.C. § 401" in the context of abrogation of sovereign immunity); *but see, e.g., MCI Telecommunications Corp. v. World Telecommunications,* 1998 WL 85757 (S.D.N.Y.), at *1.

█ The contempt power is to be used sparingly, and only in such instances where it is necessary to preserve the authority of the court. *See Chambers,* 501 U.S. at 44, 111 S.Ct. 2123; *In re Michael,* 326 U.S. 224, 227–28, 66 S.Ct. 78, 90 L.Ed. 30 (1945) (discussing criminal contempt). A court is obliged to use the least possible power adequate to the end proposed in selecting contempt sanctions. *See Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990); *Jones v. Clinton,* 36 F.Supp.2d 1118, 1125 (E.D.Ark.1999). A civil contempt fine can be used to compensate a complainant for losses suffered as a result of noncompliance with a court order. *See International Union, UMWA v. Bagwell,* 512 U.S. 821, 826–27, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (quoting *United States v. Mine Workers of America,* 330 U.S. 258, 303–304, 67 S.Ct. 677, 91 L.Ed. 884 (1947));

*Hutto v. Finney,* 437 U.S. 678, 690–91, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

■ Civil contempt must be established by clear and convincing evidence. *See Gemco Latinoamerica v. Seiko Time Corp.,* 61 F.3d 94, 98 (1st Cir.1995); *United States v. Griffin,* 641 F.Supp. 1556, 1558 (D.D.C.1986). The Supreme Court has held, in the context of criminal contempt, that perjury does not "constitute an obstruction of justice unless the perjury is part of some greater design to interfere with judicial proceedings." *United States v. Dunnigan,* 507 U.S. 87, 93, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (citing *In re Michael,* 326 U.S. at 227–28, 66 S.Ct. 78, and *Ex parte Hudgings,* 249 U.S. 378, 383–84, 39 S.Ct. 337, 63 L.Ed. 656 (1919)).

An analysis of the *Michael* case is helpful in resolving the current dispute. Concluding that false testimony before a grand jury, without more, did not "clearly show" the obstruction element, the court explained:

> All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore, it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact finding tribunal must hear both truthful and false witnesses.

*In re Michael,* 326 U.S. at 227–28, 66 S.Ct. 78. The Supreme Court cited *Clark v. United States,* 289 U.S. 1, 10, 53 S.Ct. 465, 77 L.Ed. 993 (1933), as an example of where the element of obstruction was "clearly shown." *Id.* There, "a prospective juror had testified falsely in order to qualify despite the fact that she was a partisan who would vote for a verdict of not guilty regardless of evidence of guilt." *Id.* at 228, 66 S.Ct. 78.

■ The question here is whether the obstruction element required by *Michael* and *Hudgings* in the criminal contempt context should be imported into the civil contempt arena. Although the case law in this area is sparse, I join two courts in concluding it should. *See Matter of Kitchen,* 706 F.2d 1266, 1274–75 (2d Cir.1983) (applying *Michael* in civil contempt context); *Jones v. Lincoln Electric,* 990 F.Supp. 1093, 1095 (N.D.Ind.1997) (holding that perjured expert testimony was not punishable by civil contempt sanction because of no added obstruction element).

The touchstone of *Michael* is that this Court should make sparing use of its contempt power, which should be confined to the "least possible power adequate to protect the administration of justice against immediate interruption of its business." *Dunnigan,* 507 U.S. at 93–94, 113 S.Ct. 1111 (quotations omitted). Here, the element of obstruction to the court in performance of its duty was demonstrated by clear and convincing evidence. Peretz gave intentionally false and misleading testimony concerning the source of his funds, which interfered with the ability of this Court to preserve the integrity of assets related to a SEC enforcement proceeding. The harm is quantifiable here because this Court had to hold two hearings, and the SEC had to expend considerable attorneys fees (which it estimates at amounting to $20,000) simply to recoup about *half* the amount frozen in the account. Because of Peretz's lack of financial assets, it is uncertain whether even that amount will ever be collected. *See* Def. Ex. 20, Summary Financial Disclosure Sheet Statement (indicating a negative net worth of $358,105.27).

The judgment in the amount of $15,000 represents an agreement between counsel for Peretz and PGT, and the SEC as to the appropriate amount for final judgment in this matter. The SEC has waived its request for attorneys fees and fines in light of Peretz's penurious circumstances. However, in order to vindicate the authority of the court, a finding of civil contempt by the Court is necessary.

## IV. ORDER

It is ordered, adjudged, and decreed that respondents, Peretz and PGT, are in civil contempt for having obstructed the administration of justice, by intentionally providing false and misleading testimony to the Court on February 24, 1997. Judgment is entered in the amount of $15,000.