**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Gilboa PERETZ, Defendant.**

**No. CIV.A.00–11981–PBS.**

United States District Court, D. Massachusetts.

April 13, 2004.

See, also, 52 F. Supp.2d 205.

Linda B. Bridgman, Securities and Exchange Commission, Boston, MA, for Securities and Exchange Commission, Plaintiff.

Robert Collings, United States District Court, Boston, MA, for Robert Collings.

Francis J. DiMento, DiMento & Sullivan, Boston, MA, for Gilboa Peretz, Defendant, Pro se.

Robert Lockwood, F.M.C. Devens, Ayer.

Daniel J. O'Connell, III, O'Connell & Pollenz, Boston, MA, for James Murphy, Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This case arises out of a $40 million financial fraud at Centennial Technologies, Inc. ("Centennial"). Plaintiff Securities and Exchange Commission ("SEC" or "Commission") charges pro se defendant Gilboa Peretz with aiding and abetting former Centennial CEO Emmanuel Pinez with the fraudulent reporting of $1 million in revenue for the fiscal quarter ending December 31, 1996. Specifically, the Commission charges that Peretz aided and abetted Centennial's financial fraud in violations of §§ 10(b) and 13(b)(2)(A) of the Securities Exchange Act of 1934, and Rules 10b–5 and 13b2–1, thereunder. After a four-day bench trial, which commenced on March 8, 2004, and ended on March 19, 2004, the Court orders entry of judgment in favor of Peretz, and makes

the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1. *Peretz*

An Israeli and non-native English speaker by birth, Peretz moved to Florida after a stint in the Caribbean, and he started several small companies. Although a graduate of a technical high school, he has no advanced training in computer science or engineering. The consummate entrepreneur, Peretz had an idea for controlling fleets of trucks. He established PG Technologies, Inc. ("PG Tech") in 1993 to develop and sell hardware and software for computerized fleet management systems called the "Roadmaster." The Roadmaster Junior was designed as a consumer product to monitor errant teenage drivers. The Roadmaster Fleet Systems, designed to allow companies to manage and monitor their vehicle fleets, required a "smart card" (integrated circuit memory card) to operate.

### 2. *Funding from Centennial and Pinez*

Centennial, a Massachusetts corporation, was in the business of manufacturing computer memory cards, including static random access memory ("SRAM") cards and Flash cards. Centennial did not manufacture smart cards. Centennial's chief executive officer and majority shareholder was Emmanuel Pinez, also an Israeli by birth; its chief financial officer was James Murphy. Pinez invested in start-up companies developing technology that used Centennial's computer memory cards.

In September 1995, Peretz met Pinez and made a presentation to Centennial in the hopes of obtaining investment capital. As a condition for investment, Peretz was required to move his company from Miami, where he had been living, to Massachusetts. On November 4, 1995, Pinez gave Peretz a personal check for $50,000 to assist him in moving PG Tech's operations from Miami to Saugus, Massachusetts. (Ex. 68; Stip. 6.) On November 20, 1995, Pinez delivered another personal check for $50,000 to a management company that was providing financial services to PG Tech. This second $50,000 payment was deposited to an account for the benefit of PG Tech. (Stip.6.)

Peretz was vigorously pursuing the development of the Roadmaster technology, and had an aggressive timetable. He hired an engineering company, Design Services Unlimited ("DSU"), to assist him. PG Tech had a few clients running pilots with the Roadmaster, including J.P. Noonan and V–Tec, a company in South America. PG Tech developed advertisements for television and magazines, and frequently made presentations and demonstrations to other companies in an effort to drum up business.

While Peretz was gung-ho in developing his product, he paid little to no attention to the daily details and finances of his company. He sought no legal advice, and ignored the legal details of PG Tech's transactions with Centennial. Robert Kuzara, a member of the Centennial Board of Directors and an acquaintance of Peretz's girlfriend's family, incorporated PG Tech in Massachusetts on September 18, 1995. Kuzara's company, Center for Business Planning, handled PG Tech's finances, books, and records until April 1996, when Peretz took control. After that point, Peretz relied on his office manager, Jill Cummings, to handle most financial and administrative matters. He rented office space in a building owned by Centennial which also housed Information Capture Corporation ("ICC") and WebSecure, both owned by Kuzara. Peretz also rented an apartment from Kuzara.

Pinez developed a close relationship with PG Tech. Peretz, unsophisticated in business matters, viewed Pinez as equivalent to Centennial, which had received rave reviews as a successful company in many financial publications, including the *Wall Street Journal* and *Business Week*. Altogether, Pinez invested $895,000 in PG Tech. (Stips.6, 12.) Pinez orally promised Peretz a total of $2 million dollars in investment but declined to reduce the promise to writing. In any event, Peretz didn't want the investment all at once and the two men worked out an arrangement whereby Peretz would request money as he needed it. He also insisted that Pinez counter-sign all checks above $7,000, his monthly salary. As a result of this course of dealing, Peretz was dependant on Pinez for funding.

In the spring of 1996, Centennial paid $386,500 for a 17.5 percent interest in PG Tech, made a loan of $100,000, and paid $10,000 for an option, the nature of which is unclear. (Exs. 7, 29, 75; Stip. 8.) The cash was paid and the promissory note signed on or about April 29, 1996. (Ex. 67a; Stip. 8.) On May 1, 1996, at Pinez's request, Peretz used these funds to repay Pinez $100,000 that Pinez had previously provided PG Tech from his personal funds. (Exs. 7, 32, 82; Stip. 9.)

Pinez asked Peretz to lend money to ICC, another Centennial-related startup, because Pinez said Centennial had reached its lending limit with respect to ICC. Peretz complied and transferred $260,000 to ICC on May 1, 1996. (Ex. 41; Stip. 9.) PG Tech received a promissory note in exchange. (Ex. 202.) Peretz and PG Tech had no business relationship with ICC, and did not have any business purpose for providing funds to ICC. (Stip.13.)

On June 13, 1996, Pinez sent PG Tech $10,000 by way of a personal check. (Ex. 42.) On June 18, 1996, Centennial provided another $275,000 to PG Tech in the form of a loan. (Exs.37, 38.) Peretz signed a promissory note. (Ex. 37.) At Pinez's request, Peretz transferred the entire $275,000 to ICC the following day, June 19, 1996. (Exs. 32, 44; Stip. 10.) On June 30, 1996, Pinez personally loaned PG Tech another $40,000. (Exs.7, 45.) On September 17, 1996 and October 2, 1996, Pinez personally loaned PG Tech another $145,000. (Exs.46, 47.) On or about October 3, 1996, ICC transferred $406,311 to PG Tech, apparently in partial repayment of the $535,000 PG Tech had transferred to ICC at Pinez's direction in April and June 1996. (Stip.11.) Concurrent with receipt of the ICC funds and at Pinez's request, Peretz transferred $281,311 of those funds back to Centennial and the balance of $125,000 to St. Jude Management, another Centennial affiliate. Peretz recorded the transfer to St. Jude as repayment of a loan by Pinez. (Exs. 49, 50; Stip. 11.)

### 3. *Computer Cards for Roadmaster*

In February 1996, prior to the investments, PG Tech had become a customer of Centennial and purchased computer cards from it. (Exs.58, 59.) · Robert Silva, the original equipment manufacturer ("OEM") manager of Centennial, helped design custom SRAM cards for PG Tech's Roadmaster prototypes. PG Tech wanted to develop SRAM Cards, rather than smart cards, for the new prototypes because they allowed more storage capacity. After several trials involving SRAM cards with various storage capacities, in October 1996, Centennial and PG Tech agreed on the design, and product number PM 90346 was assigned specially to PG Tech. (Ex. 61a.) The First Article Agreement for the custom 256 KB SRAM card was signed by Peretz on January 15, 1997. (Ex. 61b.) Meanwhile, the prototypes for the Roadmaster were completed at the end of 1996 and were approximately six months away

from production at that point, pending road-testing. Importantly, none of the prototypes could use a 4–megabyte (meg) flash card.

PG Tech also engaged in various legitimate transactions with Centennial for the purchase of SRAM cards. (Ex. 58.) Generally, PG Tech office manager Jill Cummings prepared purchase orders and sent them to Centennial. For example, on November 4, 1996, PG Tech ordered 200 256 KB SRAM cards at $35 per unit, an order worth $7,000. (Ex 59.) On December 9, 1996, PG Tech submitted another purchase order for 200 units at a total price of $7,000. (Ex. 63a.) The SRAM cards in these two transactions were not phony and were compatible with the Roadmaster. The goods were shipped on December 27, 1996.

### 4. Dummy cards/the Fraud

In the fall of 1996, Peretz gave Pinez a positive progress report because of likely sales to a South American company. Pinez asked Peretz if he would order $500,000 worth of cards for the project in South America. Peretz agreed—if Pinez provided the money. (Ex. 14; Stip. 14.)

On November 25, 1996, PG Tech placed an order with Centennial for 2,500 4–Meg Flash cards totaling $500,000.[1] (Ex. 62.) The sales order form was somewhat unusual in that it specified net 75 days for payment, rather than the usual 30 days, a change which required the approval of Centennial CFO James Murphy. Ten boxes full of "dummy cards," hollow cards that served no functional purpose, were shipped to PG Tech's office and kept unopened on a rack in PG Tech's storage room. (Exs.27a, 62d-e.) The sales order, visible on each of the boxes, reflected a 4–Meg card. Pinez sent a $500,000 personal check to PG Tech on the same date that PG Tech paid for the dummies. (Exs.14, 32.) There is no documentation of a loan, such as a promissory note. Peretz did not know these were dummy cards, and was surprised when he discovered they were blanks. He also never checked to make sure the cards were the kind of "PCMCIA" cards he thought he had ordered. Centennial recognized $500,000 of revenue for this transaction. (Ex. 62f-g.)

On December 19, 1996, PG Tech ostensibly placed another order for $500,000 worth of 4–Meg Flash cards. (Ex. 65a-b.) Again, these kinds of cards were incompatible with PG Tech's equipment, and were part of the fraudulent scheme. Peretz vehemently denies knowing anything about this second order. No memory cards were sent; instead a holiday fruit basket was sent. (Ex. 77.) Unlike the earlier transaction, PG Tech never sent money for this transaction. This lack of payment raised a red flag for Michael Papetti, an auditor at Coopers & Lybrand, and shortly afterwards, the scope of the fraud at Centennial became known.

On January 8, 1997, once the rumblings of problems at Centennial began, Pinez wrote PG Tech another personal check for $100,000. (Ex. 52.)

### 5. The Gig is Up

On January 30, 1997, Centennial issued a press release reporting second quarter results for the fiscal year ending June 30, 1997. It reported $31,664,000 in sales.

---

1. At trial, Peretz produced a purchase order form indicating that on November 21, 1996, PG Tech placed an order for "PCMCIA 512K" cards. (Ex. 301.) It is unclear whether this order form was ever sent to Centennial or why it had not been produced to the SEC. I decline to give it any weight. The Commission also moved post-trial to strike the affidavit of Amit Moor (Ex. 227) as inadmissible hearsay. I declined to give it any weight in making these findings of fact.

(Ex. 1.) This figure was fraudulently inflated by at least $1 million and included the fraudulent sales to PG Tech. The press release also stated: "Net income of approximately $3,462,000 for the quarter ended December 31, 1996 increased 247% as compared to the net income for the same period of the previous year." (*Id.*)

On June 30, 1997, the auditors reversed the $1 million in revenue from PG Tech in a Restatement of earnings. (Ex. 2.) The total amount of revenue adjustments for the first two quarters was $14 million.

Peretz's company, which had no financial resources, went out of business. Peretz became homeless.

### 6. *Court Proceedings*

The government brought several criminal prosecutions in connection with the Centennial financial fraud. On July 30, 1998, Pinez, Kuzara and Robert Lockwood, another former Centennial customer, were indicted for, among other things, conspiracy to commit securities fraud. Pinez pled guilty to conspiracy, was sentenced to five years incarceration, and was ordered to pay restitution of $149,650,463. Crim. No. 97–10064–JLT, Docket No. 277. Lockwood and Kuzara were charged with aiding and abetting Pinez's financial fraud. Lockwood went to trial and was found guilty. He was sentenced to 27 months incarceration and ordered to pay restitution of $425,000. (Crim. Docket No. 256.) Kuzara also went to trial, and was acquitted. (Crim. Docket No. 223.) James Murphy was indicted separately and pled guilty to one count of conspiracy to commit securities fraud and eight counts of securities fraud. He was sentenced to 15 months imprisonment in a halfway house and ordered to pay restitution of $149,650,463. (Crim. Docket No. 275.)

The SEC also pursued civil actions for aiding and abetting securities fraud against Murphy and Lockwood, in addition to Peretz. This Court entered judgment against Lockwood on May 24, 2001, enjoining him from further securities law violations and imposing a $25,000 penalty. (Docket No. 29.) The Court entered judgment against Murphy on April 29, 2002, enjoining him from further securities law violations, imposing a ten-year officer and director bar, and imposing a penalty of $150,000.

On June 5, 2001, the Court granted default judgment against Peretz in this action (Docket No. 35), but later vacated the judgment and allowed Peretz to defend the action. (Docket No. 49.) This Court issued a contempt order against Peretz in a parallel SEC action against Pinez, finding that Peretz had lied to the Court about the source of funds. *See SEC v. Pinez*, 52 F.Supp.2d 205 (D.Mass.1999). The Court previously dismissed this case for failure to prosecute (Docket No. 63), but subsequently allowed the SEC to proceed.

### CONCLUSIONS OF LAW

The SEC contends that Peretz is liable for aiding and abetting securities fraud in violation of § 10(b) because he ordered dummy computer cards in reckless disregard of the fraud. The SEC must prove its case by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Section 104 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") authorizes the SEC to bring an action against parties who aid and abet primary violations of certain provisions of the securities laws, including Section 10(b) and Rule 10b–5. Section 104 provides:

> For purposes of any action brought by the Commission under paragraph (1) or (3) of Section 78u(d) of this title, any person that *knowingly* provides substantial assistance to another person in violation of a provision of this chapter, or of

any rule or regulation issued under this chapter shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e) (emphasis added). Congress passed Section 104 to clarify that the SEC retained the authority to bring such actions after the Supreme Court held in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) that there is no private civil liability for aiding and abetting under Section 10(b). *See SEC v. Fehn*, 97 F.3d 1276, 1282–83 (9th Cir.1996); *SEC v. Lybrand*, 200 F.Supp.2d 384, 399 (S.D.N.Y.2002). Section 104 does not define "knowingly."

"Courts applying Section 104 have generally analyzed the provision in light of pre-*Central Bank* aiding and abetting case law." *Lybrand*, 200 F.Supp.2d at 399. *See Fehn*, 97 F.3d at 1286 ("We need not address whether Section 104 ... creates wholly new legal consequences, since the SEC's power to enjoin aiding and abetting violations of Section 10(b) ... antedated Section 104."). Prior to *Central Bank*, the circuits were split as to whether recklessness was sufficient or whether intent was required, but the Court declined to resolve the dispute. *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 844 (2d Cir.1998) ("[O]ne of the questions on which the Supreme Court granted certiorari in *Central Bank* was whether recklessness satisfies the scienter requirement for aiding and abetting in the

absence of a duty to disclose or act.... Rather than resolving this issue, the Supreme Court held that aiding and abetting claims fall outside of the scope of § 10(b) altogether, without drawing any distinction between claims requiring intent and claims requiring only recklessness"); *Fehn*, 97 F.3d at 1288 ("The elements of the new Section 104 clearly mirror the elements this Court and others traditionally used to define aiding and abetting under Section 10(b). In our view, the symmetry between the elements of aiding and abetting *before Central Bank* and *after* Section 104 is a strong indication that Congress intended Section 104 to preserve the definition of aiding and abetting as it existed pre-*Central Bank*.") (emphasis in original) (internal citations omitted).

 The Court therefore looks to the pre-*Central Bank* test for whether a defendant is liable as an aider and abetter of a violation of § 10(b) or Rule 10b–5, established by the First Circuit in *Cleary v. Perfectune*, 700 F.2d 774 (1st Cir.1983). To establish liability the SEC must prove:

(1) the commission of a violation of § 10(b) or rule 10b–5 by the primary party;

(2) the defendant's general awareness that his role was a part of an overall activity that is improper; and

(3) knowing and substantial assistance of the primary violation by the defendant.

*Id.* at 777, overruled on other grounds by *Central Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).[2] Courts

**2.** Other courts have articulated a slightly different formulation for this test. *See, e.g., IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980) (defining test for aiding and abetting liability as "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary

violation."); *Graham v. SEC*, 222 F.3d 994, 1000 (D.C.Cir.2000) ("Although variously formulated, three principal elements are required to establish liability for aiding and abetting a violation of section 10(b) and Rule 10b–5: (1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'—i.e., that she

have also applied varying levels of scienter depending on the duty of disclosure owed by the defendant. The First Circuit stated in *Cleary:*

> Courts generally have held that in the absence of a duty of disclosure, a defendant should be held liable as an aider and abettor only if the plaintiff proves that the defendant had actual knowledge of the improper activity of the primary violator and of his role in that activity. Where the defendant has a duty to disclose the primary violations, however, courts have been willing to impose liability on the basis of a recklessness standard.

700 F.2d at 777 (affirming summary judgment in favor of defendants where there was no basis for imposing a duty to disclose). *See also IIT,* 619 F.2d at 923 (noting that while "reckless conduct will generally satisfy the scienter requirement ... there are special considerations in applying this general principle to aiders and abettors").

"Among the situations in which a duty to disclose may arise are where the defendant possesses insider information, where a controlling person consents to and approves of the fraudulent practices, or where the law imposes special obligations, as for accountants and brokers." *Cleary,* 700 F.2d at 777 (internal citations omitted). *See also Graham,* 222 F.3d at 1005–05 & n.

1 (noting that registered representatives associated with a member firm of the National Association of Securities Dealers have an independent duty to investigate).

Under this standard for establishing scienter applicable to one who does not owe a fiduciary duty or duty of disclosure, I conclude that Peretz did not knowingly provide assistance to Pinez's securities fraud, or act with conscious disregard of the fraud, when he ordered the computer cards in his first purchase order.[3] I find that he did not know the cards were dummies or that the cards shipped were incompatible with his product. In light of his trusting, deferential course of conduct with Pinez, he essentially did whatever Pinez requested with only minimal inquiry or pushback. He had no knowledge that Centennial was in any economic trouble or was padding its financials. Peretz respected Pinez as the head of Centennial, a high-flying, high-tech company widely lauded by national publications. A rough and tumble entrepreneur in the hey day of high-tech startups, Peretz was not careful about any of his financial affairs; his only focus was on developing and selling the product itself. It is not surprising that he failed to check the boxes to see if he received the right cards.

The second, so-called "fruit basket" purchase order is more of a mystery. Peretz

---

rendered such assistance knowingly or recklessly.").

**3.** The Commission seeks an adverse inference of liability against Peretz from the invocations of the Fifth Amendment privilege by Robert Kuzara and Robert Lockwood in response to questions posed by the SEC during depositions and at trial. In making this ultimate conclusion, the Court declines to draw the adverse inference because there is insufficient evidence that Kuzara, Lockwood and Peretz were ever involved in a conspiracy to commit securities fraud or any other circumstances that would suggest that such an adverse infer-

ence would be trustworthy. *See, e.g., United States v. Local 560, Int'l Brotherhood of Teamsters,* 780 F.2d 267, 292 n. 32 (3d Cir.), cert. denied, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986) ("[T]here must be independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference."); *United States v. District Council of New York City,* 832 F.Supp. 644, 652 (S.D.N.Y.1993) ("[T]he fairness of taxing a party with a non-party's conduct depends upon the relationships between them, here the alleged conspiratorial relationship .... Whether the proof at trial will support the inference remains to be seen.").

testified at trial that he knew nothing about it and during his deposition testimony he stated he did not remember a second order. Jill Cummings, the officer manager, testified in a deposition that Peretz ordered her to backdate the order, which was actually made in January. In light of the fact that Pinez has been convicted of securities fraud and could easily have fabricated a purchase order, that the course of dealing was different here because PG Tech did not send a check and Centennial did not send cards (even dummy cards), and that Ms. Cummings did not testify in person so that the Court could assess her credibility, on balance the Court finds that the SEC failed to meet its burden of showing that Peretz intentionally sent a fraudulent backdated purchase order to get dummy cards to inflate Centennial's revenues.

In sum, I find that the SEC failed to prove that Peretz had knowledge of Pinez's security fraud, and while he may have been negligent in not checking the dummy shipment, he did not have the scienter necessary to aid and abet Peretz in committing the securities fraud.

### ORDER

Judgment shall enter in favor of Defendant Peretz.