SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Stephen E. APOLANT, Defendants.

No. 04–CV–04199 (ADS)(ETB).

United States District Court,
E.D. New York.

Jan. 31, 2006.

U.S. Securities and Exchange Commission by Reid A. Muoio and H. Michael Semler, Trial Attorneys, Washington, DC, for Plaintiff.

Altman & Company by Steven Altman, Esq., New York City, for the Defendant Stephen E. Apolant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This securities fraud action was originally brought by the Securities and Exchange Commission ("SEC") against four persons, including the Defendant Stephen E. Apolant ("Apolant"), seeking an injunction, disgorgement of unlawful profits, and civil penalties. The case arises out of an alleged fraudulent scheme to manipulate the price of the stock of a publicly traded company, Spectrum Brands Corp., ("Spectrum Brands"), in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Currently pending before the Court is a motion by Apolant to vacate the entry of default and to dismiss the claim against him.

## I.  BACKGROUND

### A.  Factual Background

According to the amended complaint, following the September 11, 2001 terrorist attacks, Spectrum Brands devised a scheme to exploit fears of bio-terrorism by

marketing a product called the "DeGER-Minator," a hand-held ultra-violet lighting device that was advertised as being capable of "wiping out surface germs in less than 5 seconds, including anthrax."

The complaint also alleges that during the relevant period of time, Spectrum Brands was secretly managed and controlled by a group of stock promoters located in Hicksville, New York, some of whom were convicted felons. The principal figure of this group was Saverio Galasso III, ("Galasso"), who had obtained the distribution rights to the DeGERMinator, and who had also pled guilty in August 2001 to racketeering charges arising from other frauds. Also participating in the control and management of Spectrum was David Hutter ("Hutter"), who pled guilty to unrelated money laundering charges in August 2001, and Charles Dilluvio ("Dilluvio").

To conceal the "pervasive control" exercised by Galasso, Hutter, and Dilluvio from the investing public and regulatory agencies, Spectrum Brands held out Michael J. Burns ("Burns") as its president and its only officer and director and stated that its corporate address was in Hauppauge, New York. On October 31, 2001, Spectrum Brand filed a Form 8–K with the SEC stating that all former officers and directors had resigned, "leaving Mr. Burns as the Sole Officer and Director." In addition, the Form 8–K listed Hauppauge, New York as the company's address. The amended complaint alleges that in fact Burns exercised little or no management authority at Spectrum Brands and that the operations of the company were controlled by Galasso from an office at 33 Tech Street, Hicksville, New York.

In addition to the false Form 8–K, the amended complaint also alleges that Spectrum Brands used its website, press releases, faxes, and e-mails to tout its success in combating "bio-terrorism" and "cyber-terrorism," and launch predictions of dramatic increases in stock prices. However, none of the information disseminated to the public disclosed that Spectrum Brands was controlled by Galasso, a convicted felon.

As a result, the price of Spectrum Brand's stock rose from approximately $4 per share on November 1, 2001, to $11.75 on November 5, 2001, with an intra-day high of $14 on November 5, 2001. As of December 11, 2001, Galasso had placed approximately one million shares of Spectrum Brands stock in an offshore account he controlled. However, before Galasso was able to sell the stock he, along with Hutter and Dilluvio, were all arrested on criminal securities fraud charges related to their activities with regard to Spectrum Brands.

The amended complaint further alleges that Apolant, who was a former registered representative who has been barred from selling securities in Georgia and New Jersey, worked with Galasso and was the "creative writer" for Spectrum Brands during November and early December 2001. As part of his "creative writing duties," he participated in the drafting of a "corporate profile" of Spectrum Brands that identified Burns as the "CEO and Chairman of the company." The profile indicated that Burns was "very close to naming several key management personnel," and that he had "two strong advisory board members." The profile did not identify Galasso or his role in Spectrum Brands. Apolant arranged for this profile to be "blast faxed" to potential investors by Anthony Leone of a company known as Equity Spotlight. Apolant also arranged for portions of the profile to be posted by Sky Market Direct, a Canadian marketing firm. Sky Market posted this material on its website and also distributed it via

"spam" or unsolicited email to numerous potential investors.

The amended complaint alleges that Apolant aided or abetted the fraudulent scheme by writing or assisting in the writing of several press releases, all of which identified Burns as the individual directing Spectrum Brand's activities when, in fact, Galasso controlled the company. For example, a press release dated November 1, 2001, stated that Burns had been appointed "as CEO and Chairman of the Company ...," and quoted Burns as stating that he is "very excited to be heading up this new project, and will be appointing top tier advisors and managers to develop Spectrum into a major player in the Homeland Security arena." Similar press releases dated November 6, 8, 13, 16, 27 and December 4, 2001, all identified Burns as the "Chairman/CEO" of Spectrum Brands. In addition, the press releases indicated that they were being issued from Hauppauge, New York, when, in fact it is alleged that the Hauppauge location was merely a mail drop and that all of the operations of the company were conducted from the Hicksville office.

Importantly, the complaint alleges that all of Apolant's activities were conducted from the same office used by Galasso, in Hicksville, New York and that Apolant knew about Galasso's fraudulent scheme. Further, it is alleged that Apolant knew that the corporate profile and press releases that he helped draft were false at the time when he created them; that Galasso, rather than Burns, controlled and managed the operation of Spectrum Brands; and that these facts were not disclosed to potential investors. As compensation for his role in the fraud, on October 29, 2001, Apolant received 100,000 shares of Spectrum Brands stock.

## B. Procedural History

The SEC filed the first complaint in this action on September 27, 2004 against four individuals, all of whom, except for Apolant, have since settled the action. Following the filing of the complaint, Apolant, on January 1, 2005, filed a timely motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b), on the ground of failure to state a claim. In opposition, on February 3, 2005, the SEC filed an amended complaint that included additional specific allegations directed at Apolant. On February 10, 2005, Apolant submitted reply papers arguing that the SEC had not cured the deficiencies in its complaint and continued his original position that the complaint be dismissed. On July 13, 2005, the Court denied the motion to dismiss the first complaint as moot in light of the filing of the amended complaint.

On July 15, 2005, Apolant wrote a letter to the Court seeking permission to file a second motion to dismiss the complaint. On July 19, 2005, the Court denied the application and noted that Apolant was in default for failing to file a proper response to the amended complaint. Subsequently, on August 4, 2005, Apolant filed this motion to vacate his default and to dismiss the amended complaint.

## II. DISCUSSION

### A. As to the Motion to Vacate the Default

Rule 55(c) provides, "For good cause shown, the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Fed.R.Civ.P. 55(c). Rule 60(b) authorizes a court to vacate the entry of default on the basis of, among other things, "mistake, inadvertence, surprise or excusable neglect ... [or if] the judgment is void." Fed.

R.Civ.P. 60(b)(1), (4). Whether to grant a motion to vacate a default is within the sound discretion of the district court. *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158 (2d Cir.2004).

In this case the Defendant's failure to answer the amended complaint does not appear to be willful. Instead of filing an answer or renewing the motion to dismiss to address the amended complaint, the Defendant filed a reply brief and argued that the amended complaint failed to cure any defects raised by the motion to dismiss. The procedural tactic that the Defendant employed has support in the law. As explained by a learned treatise, when faced with an amended pleading in response to a motion to dismiss, the Court may either considered the earlier motion as against the amended complaint, or deny the motion if the Court finds that the amendments to the complaint cured the deficiencies raised by the motion. *See* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 1476 (2d ed.2005).

█ Here, the Court took the latter approach and denied the motion to dismiss. Technically, this placed the Defendant in default for failing to properly respond to the Plaintiff's amended complaint. However, the Defendant timely filed a reply to the motion and has continued to expeditiously defend the action. To hold the Defendant in default at this point "would be to exalt form over substance." *Id.* Accordingly, for good cause shown, the Court vacates the default and will address the merits of Apolant's latest motion to dismiss.

## B. As to the Motion to Dismiss

### 1. The Motion to Dismiss Standard

In deciding a motion to dismiss in a securities fraud case, a court follows the well-established principles of Rule 12(b)(6).

The court must assume the allegations contained in the complaint are true, and can only grant a motion to dismiss if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle the plaintiff to the relief sought. *See SEC v. Zandford,* 535 U.S. 813, 818, 122 S.Ct. 1899, 1902, 153 L.Ed.2d 1 (2002) (citing *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)); *Wright v. Ernst & Young LLP,* 152 F.3d 169, 173 (2d Cir.1998). In general, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

█ However, in cases involving fraud, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see also Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004); *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168 (2d Cir.2000). In securities fraud claims brought under Section 10(b) and Rule 10b–5, the particularity requirements of Rule 9 apply to both private parties and the SEC. *SEC v. Pimco Advisors Fund Management LLC,* 341 F.Supp.2d 454, 462 (S.D.N.Y.2004). The purpose of Rule 9(b) is threefold: (1) to provide the defendant with fair notice of the claims against him; (2) to protect the defendant from harm to his reputation or goodwill; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1248 (2d Cir.1987).

In order to satisfy the particularity requirement under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quotations and citations omitted); *accord Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

## 2. The Aiding and Abetting Securities Fraud Claim

The amended complaint asserts one cause of action against Apolant, under 15 U.S.C. § 78t(e), alleging that he aided and abetted the Spectrum Brands violations of Section 10(b) and Rule 10b–5 of the Exchange Act. The SEC is explicitly authorized by statute to bring administrative actions and injunctive proceedings to enforce a variety of statutory prohibitions. 15 U.S.C. § 78u(d). The Private Securities Litigation Reform Act of 1995 ("PSLRA") authorized the SEC to bring civil actions against parties who aid and abet primary violations of certain provisions of the securities laws, including Section 10(b) and Rule 10b–5. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 176 (2d Cir.1998). Section 104 of the PSLRA clarified the SEC's authority to bring such actions after the Supreme Court held in *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that private parties could not seek civil liability for aiding and abetting under Section 10(b). *See SEC v. Lybrand,* 200 F.Supp.2d 384, 399 (S.D.N.Y.2002); *see also SEC v. Fehn,* 97 F.3d 1276, 1282–83 (9th Cir.1996); *SEC v. Peretz,* 317 F.Supp.2d 58, 62–63 (D.Mass.2004)

Section 104 provides:

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C.A. § 78t.

The elements of an aiding and abetting violation in the Second Circuit that the SEC must establish include: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Penthouse Intern., Inc.,* 390 F.Supp.2d 344, 355 (S.D.N.Y.2005) (citing *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980)); *see also SEC v. Lybrand,* 200 F.Supp.2d 384, 399 (S.D.N.Y.2002); *SEC v. Norton,* 21 F.Supp.2d 361, 364 (S.D.N.Y.1998); *SEC v. Militano,* 773 F.Supp. 589, 594 (S.D.N.Y. 1991).

### a. Primary Violation

The underlying primary violation in the amended complaint is a violation of Section 10(b) of the Exchange Act and Rule 10b–5. In order to state a claim under that section, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000); *see also Basic, Inc. v. Levinson,* 485 U.S. 224, 235 n. 13, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Here, there is no doubt, and the Defendant does not contest,

that the amended complaint sufficiently alleges that Spectrum Brands and the other former defendants committed a primary violation of Section 10(b) and Rule 10b–5.

### b. Knowledge and Substantial Assistance

■■ Generally, to satisfy the second and third prongs of an aiding and abetting violation, the scienter element requires that the assistance that the defendant rendered be knowing and substantial. *SEC v. DiBella,* No. Civ. 304CV1342EBB, 2005 WL 3215899, at *10 (D.Conn. Nov. 29, 2005); *S.E.C. v. Lybrand,* 200 F.Supp.2d 384, 400 (S.D.N.Y.2002). In cases where the defendant owes a fiduciary duty to the plaintiff, the scienter requirement can be satisfied by showing recklessness. *See id.; see also Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *SEC v. Milan Capital Group, Inc.,* 2000 WL 1682761, at *9 (S.D.N.Y. Nov. 9, 2000).

■ Here, Apolant is alleged to have been a registered representative, namely, a person licensed to sell securities and possessing the legal power of an agent. However, the amended complaint only alleges that he was working for Spectrum as a "creative writer" and not as an agent. Thus, it appears that Apolant did not have a fiduciary duty that would subject him to the lower standard of recklessness. Nevertheless, the amended complaint sufficiently states the higher scienter standard of knowledge.

The amended complaint asserts that "Apolant knew at all relevant times ... that Galasso rather than Burns controlled and managed Spectrum Brands." Plt.'s Amend. Compl. ¶ 30. The amended complaint also alleges that Apolant's activities were conducted out of the same offices used by Galasso and that he knew about the fraudulent scheme. Further, the amended complaint specifically alleges that Apolant knew that the corporate profile

and press releases were false at the time when he created them and that Galasso, rather than Burns, controlled and managed the operation of Spectrum Brands. The amended complaint also states that Apolant knew that the control of the corporation was intentionally not disclosed to potential investors and that Galasso reviewed the releases that were drafted by Apolant before they were issued.

Apolant argues that the Spectrum Brands' statements regarding Burns being the President and CEO were "literally true," and as a result, Apolant could not at the time have known them to be false. At this point in the litigation, the Court must "assume the allegations contained [in the amended complaint] are true ..." and resolve "all potential factual disputes ... in [the Plaintiff's] favor." *Zandford,* 535 U.S. at 818, 122 S.Ct. at 1902–03. In a motion to dismiss, the Court is limited to deciding whether "the allegations of the complaint, if true, entitle the SEC to relief." *Id.*

■ The Court finds that the allegations in the amended complaint would entitle the SEC to relief. If true, the amended complaint sufficiently alleges that Apolant provided substantial assistance to Spectrum's scheme of concealing the true controlling force behind the company. Potential investors had the right to know that the company they were funding was surreptitiously controlled or unlawfully influenced by a group of convicted felons. *See SEC v. C. Jones & Co.,* 312 F.Supp.2d 1375, 1380 (D.Colo.2004) (finding the element of scienter adequately alleged where an individual *hid his complete control* over a company, its shareholders, and its securities). In addition, according to the allegations in the amended complaint, Apolant wrote in the press releases that Spectrum was based out of Hauppauge, New York, when in fact that address was nothing more than a mail drop.

This misrepresentation, although minor on its face, may become material when paired with the other allegations concerning the true control and location of Spectrum management, which was allegedly operated from Galasso's office in Hicksville.

### 3. The Particularity Requirement

Apolant also argues that the amended complaint lacks the required specificity. This argument has no merit. "Rule 9(b) is not intended to be an insurmountable hurdle for claimants to overcome, but was designed to afford defendants fair notice of the fraud alleged against them." *Lehman Bros. Commercial Corp. v. Minmetals Int'l*, No. 94 CIV. 8301, 1995 WL 608323, *3, 1995 U.S. Dist. LEXIS 15185, at *7 (S.D.N.Y. Oct. 16, 1995) (quotations and citations omitted); *see also Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990) ("The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based.").

 Here, according to the amended complaint, Apolant not only had knowledge of the scheme, but worked with Galasso and his associates in the same office; had his work reviewed by them; and was substantially compensated for his role in the fraud as the "creative writer." The amended complaint sets forth several specific publications and press releases that Apolant assisted in writing, allegedly in furtherance of the fraud. "Thus, the complaint identifies with particularity several documentary sources that support the [SEC's] belief that serious ... problems existed...." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.2000). After reviewing the allegations in the amended complaint, the Court concludes that the claims are pleaded with sufficient particularity to withstand this motion to dismiss.

### III. CONCLUSION

For all the foregoing reasons, it is hereby

**ORDERED**, that Apolant's default in answering is vacated, and it is further

**ORDERED**, Apolant is directed to serve and file his answer to the amended complaint within 20 days from the date of this Order; and it is further

**ORDERED**, that the motion by Apolant to dismiss the amended complaint is DENIED in its entirety; and it is further

**ORDERED**, that the parties are directed to contact United States Magistrate Judge E. Thomas Boyle to schedule the completion of discovery.

**SO ORDERED.**